453 F.2d 463
 3 ERC 1232, 91 P.U.R.3d 474, 1 Envtl.
L. Rep. 20,496
 SCENIC HUDSON PRESERVATION CONFERENCE et al., Petitioners,
v.
FEDERAL POWER COMMISSION, Respondent, and Consolidated
Edison Company of New York, Inc., Town of Cornwall
and Village of Cornwall, Intervenors.
 Nos. 1033-1038, Dockets 35678, 35676, 35677, 35683, 35688 and 35689.
 United States Court of Appeals,
Second Circuit.
 Argued June 9, 1971.
Decided Oct. 22, 1971.
Rehearing and Hearing En Banc Denied Nov. 26, 1971.
 
 Lloyd K. Garrison, New York City (Albert K. Butzel, Paul Weiss, Goldberg, Rifkind, Wharton & Garrison, New York City, on the brief), for petitioner Scenic Hudson Preservation Conference.
 Philip Weinberg, Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen. of N. Y., Samuel A. Hirshowitz, First Asst. Atty. Gen., Cyril H. Moore, Jr., Asst. Atty. Gen., on the brief), for petitioner Palisades Interstate Park Comm.
 Eugene Margolis, New York City (J. Lee Rankin, Corp. Counsel, Evelyn Junge, New York City, on the brief), for petitioner City of New York.
 Lloyd K. Garrison, New York City (David Sive, Sigmund Anderman, Bertram Braufman, Winer, Neuburger & Sive, New York City, on the brief), for Petitioner The Sierra Club and its Atlantic Chapter.
 Lloyd K. Garrison, New York City (James Marshall, Henry Winestine, Marshall, Bratter, Greene, Allison & Tucker, New York City, on the brief), for petitioner The Wilderness Society.
 Lloyd K. Garrison, New York City (Angus Macbeth, John H. Adams, New York City, National Resources Defense Council, Inc., on the brief), for petitioners Izaak Walton League of America, National Audubon Society and National Parks and Conservation Assn.
 Gordon Gooch, Gen. Counsel (J. Richard Tiano, Asst. Sol., Leonard D. Eesley, Asst. Gen. Counsel, John D. Lane, Raymond E. Hagenlock, Charles K. Barrow, Attys., F. P. C., Washington, D. C., on the brief), for respondent.
 Cameron F. MacRae, New York City (Carl D. Hobelman, G. S. Peter Bergen, Sheila H. Marshall, Jeffrey E. Silver, LeBoeuf, Lamb, Leiby & MacRae, New York City, on the brief), for intervenor Consolidated Edison Co. of New York, Inc.
 James R. Loeb, Rider, Weiner & Loeb, Newburgh, N. Y., on the brief, for intervenor Town of Cornwall.
 Before FRIENDLY, Chief Judge, and HAYS and OAKES, Circuit Judges.
 HAYS, Circuit Judge:
 
 
 1
 By Opinion No. 584, dated August 19, 1970, the Federal Power Commission granted a license to Consolidated Edison Company of New York, Inc., to construct, operate, and maintain a pumped storage project along the western shore of the Hudson River at Cornwall, New York. Eight parties[1] have filed petitions pursuant to Section 313(b) of the Federal Power Act, 16 U.S.C. Sec. 825l(b) (1964) seeking to set aside this order on various grounds. The issues raised by these petitions are both complex and important, involving, as they do, the conflict between the needs of a highly technological society and the increased awareness of environmental considerations.
 
 
 2
 The opinion and order of the Federal Power Commission presented here for review follow by five years the earlier remand by this court in Scenic Hudson Preservation Conference v. Federal Power Commission, 354 F.2d 608 (2d Cir. 1965), cert. denied sub nom., Consolidated Edison Co. of New York v. Scenic Hudson Preservation Conference, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966), in which the petitions challenged three 1965 orders of the Commission licensing the project and refusing to reopen proceedings and take additional evidence on various issues. In the intervening period extensive hearings have been held, two decisions have been rendered by a Hearing Examiner and the Commission has issued its own opinion.
 
 
 3
 The new proceedings have produced a project that is different in some ways from the project that was before this court in 1965.
 
 
 4
 The functional elements of the project remain the same. It is still to be the largest pumped storage plant in the world and its principal function, to provide energy for peak load periods, is unchanged. The proposed location is the same as that previously proposed, the Hudson River at approximately river mile 56.5, about 40 miles north of New York City at Storm King Mountain near Cornwall, New York, "an area of unique beauty and major historical significance." Scenic Hudson, supra at 613. The project would consist, as did the earlier version, of an upper reservoir, a tunnel between the reservoir and the powerhouse, and the powerhouse itself, a pumpinggeneration station located at the riverside containing eight reversible pumpturbine and motor generation units as well as switching gear and primary transmission lines. However, unlike the project presented in 1965, which provided for a powerhouse that was 80 per cent underground, the powerhouse now licensed by the Commission is to be entirely underground.
 
 
 5
 The upper reservoir would be situated approximately 10,000 feet south and west of the powerhouse in a natural mountain basin behind Storm King Mountain. When filled to its maximum elevation it would have a surface area of 240 acres. It would be formed and enclosed by five earth and rock dikes. The lower reservoir would be the Hudson River itself.
 
 
 6
 The capacity of the eight pumpinggenerating units in the powerhouse would be 2,000 megawatts, or 2,000,000 kilowatts.[2] However, the project would be constructed in a manner which would permit enlargement to a maximum of 3,000 mw. Eight discharge tunnels from the reversible pump-turbine and motor generation units would convey water between each turbine and an open tailrace leading to the river. The tailrace with abutments at both ends would run 685 feet along the river. A fish protective device is to be located in front of the tailrace intake.
 
 
 7
 The third major facet of the project relates to transmission facilities. Submarine cable installations and spare pipes would transmit the energy generated in the powerhouse under the Hudson River and would continue underground on the east side of the river for approximately 1.6 miles to a point out of sight of the river. At this point overhead transmission would commence and would continue for approximately 9.2 miles through Putnam County to Con Edison's existing Pleasant Valley-Millwood-Sprain Brook transmission right of way. Changes have been made in the proposed route and the towns of Cortlandt, Putnam Valley and Yorktown, which challenged the route before this court in 1965, no longer do so.
 
 
 8
 The project would function in the manner described in our earlier opinion. Scenic Hudson, supra at 612. The units in the powerhouse would use off-peak energy generated not at the project but at other facilities in the Con Ed system to pump water from the Hudson River to the upper reservoir. When needed for peak power production, that is, during hours of highest kilowatt demand, the units would reverse direction of rotation and provide power derived from the fall of the water released into the river from the upper reservoir. This power would then be transmitted through the transmission system described above. "The water in the upper reservoir may be regarded as the equivalent of stored electrical energy; in effect, Consolidated Edison wishes to create a huge storage battery at Cornwall." Scenic Hudson, supra at 612.
 
 
 9
 A visitor's information center and picnic and parking facilities, proposed in the original project for the powerhouse site, have been eliminated. In their place, a 57 acre, mile-long park is to be constructed along the riverfront. Additional recreational facilities are to be provided at a 36 acre scenic overlook inland from the project with access from the existing State Highway 9-W.
 
 
 10
 As an alternative the Commission has licensed the powerhouse aspect of the project at a location within Palisades Interstate Park, approximately one and one-half miles downstream from the Storm King Mountain site. Construction at the Palisades site is to be considered approved by the Commission only if construction at the Storm King Mountain site "shall be precluded on a petition to review this order."
 
 
 11
 The petitions in this case are occasioned by the "grave concern" aroused among conservationist groups by the Storm King project. Scenic Hudson, supra at 612. The petitions allege lack of compliance with the terms of our earlier remand, absence of substantial evidence to support the Commission's findings, and failure to comply with statutory mandates. We find, however, that the Commission has fully complied with our earlier mandate and with the applicable statutes and that its findings are supported by substantial evidence. In view of the extensive powers delegated to the Commission and the limited scope of review entrusted to this court, it is our duty to deny the petitions.
 
 I.
 
 12
 Congress has given the Federal Power Commission broad responsibility for the development of national policies in the area of electric power. In Section 4(e) of the Federal Power Act, 16 U.S.C. Sec. 797(e) (1964), the Commission is authorized
 
 
 13
 "To issue licenses * * * for the purpose of constructing, operating, and maintaining dams, water conduits, resservoirs, power houses, transmission lines or other project works necessary or convenient for the development and improvement of navigation and for the development, transmission, and utilization of power across, along, from, or in any of the streams or other bodies of water over which Congress has jurisdiction * * *."
 
 
 14
 There are statutory limitations on the issuance of such licenses. Section 10(a) of the Act, 16 U.S.C. Sec. 803(a) (1964), requires
 
 
 15
 "That the project adopted * * * shall be such as in the judgment of the Commission will be best adapted to a comprehensive plan for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, for the improvement and utilization of waterpower development, and for other beneficial public uses, including recreational purposes * * *."
 
 
 16
 The Commission is now obliged also to consider the environmental factors covered by the National Environmental Policy Act, 42 U.S.C. Secs. 4321 et seq. (Sec. 1970).
 
 
 17
 In the Federal Power Act Congress granted the Commission "sweeping authority and a specific planning responsibility." The Act "was the outgrowth of a widely supported effort on the part of conservationists to secure the enactment of a complete scheme of national regulation which would promote the comprehensive development of the nation's water resources." Scenic Hudson, supra at 613 and authorities cited there.
 
 
 18
 The scope of review of the Commission's exercise of its authority and responsibility is narrowly limited. The Act, Sec. 313(b), provides that "[t]he finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." 16 U.S.C. Sec. 825l(b). In assessing the factual contentions raised in the petitions, this court's authority "is essentially narrow and circumscribed." Permian Basin Area Rate Cases, 390 U.S. 747, 766, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312 (1968). The licensing of projects such as the Storm King plant and the evaluation of their environmental impact has been entrusted to "the informed judgment of the Commission, and not to the preferences of reviewing courts." Id. at 767, 88 S.Ct. at 1360.
 
 
 19
 The statutory standard of substantial evidence is "something less than the weight of the evidence and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966). In a recent case involving these principles of court review, the Supreme Court said:
 
 
 20
 "Insofar as the Court of Appeals' opinion implies that there was not substantial evidence to support a finding of some benefits, it is clearly wrong. And insofar as the court's opinion implies that the responsibilities assumed by Gainesville in combination with the benefits found to accrue to Florida Power were insufficient to constitute 'compensation * * * reasonably due,' the Court of Appeals overstepped the role of the judiciary. Congress ordained that that determination should be made, in the first instance, by the Commission, and on the record made in this case, the Court of Appeals erred in not deferring to the Commission's expert judgment." Gainesville Utilities Department v. Florida Power Corp., 402 U.S. 515, 527, 91 S.Ct. 1592, 1599, 29 L.Ed.2d 74 (1971).
 
 
 21
 Petitioners would have us reject these familiar principles because, they argue, different standards ought to prevail with respect to issues arising in an environmental context.[3] There is an effort to find a basis for this position in our earlier remand in Scenic Hudson and in cases which have taken a similar approach.[4] See, e. g., Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); Udall v. Federal Power Commission, 387 U.S. 428, 87 S.Ct. 1712, 18 L.Ed.2d 869 (1967); Zabel v. Tabb, 430 F.2d 199, 213 (5th Cir. 1970), cert. denied, 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1971).
 
 
 22
 To read these cases as sanctioning a new standard of judicial review for findings on matters of environmental policy is to misconstrue both the holdings in the cases and the nature of our remand in Scenic Hudson. An element common to all these cases was the failure of an agency or other governmental authority to give adequate consideration to the environmental factors in the situations with which they were presented. In Citizens to Preserve Overton Park, Inc. v. Volpe, supra, 401 U.S. at 416, 91 S.Ct. at 824, for example, the Court remanded the case to the district court to determine whether the Secretary of Transportation's decision "was based on a consideration of the relevant factors." The Court pointed out that "[a]lthough this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." Id. In Udall v. Federal Power Commission, supra, 387 U.S. at 450-451, 87 S.Ct. 1712, the remand to the Commission instructed it to explore the "neglected phases of the cases" and to make "an informed judgment on these phases of the cases." The Court explicitly stated that it expressed "no opinion on the merits." It added, "It is not our task to determine whether any dam at all should be built or whether if one is authorized it should be private or public." Id. at 450, 87 S.Ct. at 1724.
 
 
 23
 In our opinion in Scenic Hudson, supra, remanding the 1965 orders of the Commission, we were careful to make it clear that we were raising no question of change in the basic standard of administrative review and that the purpose of our remand was only to require the proper performance of its functions by the Commission. We said:
 
 
 24
 "While the courts have no authority to concern themselves with the policies of the Commission, it is their duty to see to it that the Commission's decisions receive that careful consideration which the statute contemplates." Id. at 612 of 354 F.2d.
 
 
 25
 ******
 
 
 26
 * * *
 
 
 27
 "This court cannot and should not attempt to substitute its judgment for that of the Commission. But we must decide whether the Commission has correctly discharged its duties. * * The Commission must see to it that the record is complete." Id., at 620.
 
 
 28
 Where the Commission has considered all relevant factors, and where the challenged findings, based on such full consideration, are supported by substantial evidence, we will not allow our personal views as to the desirability of the result reached by the Commission to influence us in our decision. We now turn therefore to an examination of whether our remand has been complied with, whether there is substantial evidence to support the Commission's decisions on the issues remanded and other challenged issues, and whether the Commission has complied with all applicable statutory requirements.
 
 II.
 
 29
 In our opinion remanding this proceeding to the Commission we directed the Commission to weigh a number of factors which we believed had not been given adequate consideration. Holding that "recreational purposes" in Sec. 10(a) of the Act (16 U.S.C. Sec. 803(a) (1964)) "encompasses the conservation of natural resources, the maintenance of natural beauty, and the preservation of historic sites," we required the Commission "properly [to] weigh each [such] factor." Scenic Hudson, supra at 614. We held "that the Commission is under a statutory duty to give full consideration to alternative plans" (Id. at 617). We criticized the Commission's refusal to receive "proffered information on fish protective devices and underground transmission facilities. * * *" Id. at 620, and directed it to "take the whole fisheries question into consideration before deciding whether the Storm King project is to be licensed." (Id. at 624). We ordered the Commission to weigh "the aesthetic advantages of underground transmission lines against the economic disadvantages" (Id. at 623). In sum the Commission was admonished to "reexamine all questions on which we have found the record insufficient and all related matters." (Id. at 624).
 
 
 30
 On January 25, 1966, acting on our remand, the Commission ordered that further proceedings be commenced before a Hearing Examiner. In that order the Commission said:
 
 
 31
 "We do not understand the Court's order as restricting any further proceedings to the specific matters on which it found the present record insufficient to support our previous determinations and we do not believe it would be in the public interest to do so. The record in the first two hearings in the proceeding will, of course, be part of the present hearing. But all parties will be free to offer timely presentations of evidence on all matters relevant to the question whether a license should be granted."
 
 
 32
 The hearings were commenced on November 14, 1966 and with several brief recesses, were concluded on May 23, 1967. A motion of the State of Connecticut's Board of Fisheries and Game to intervene was subsequently granted, and further hearings were held on the issue of the protection of fish. These hearings were closed on October 16, 1967. On August 6, 1968, the Hearing Examiner issued his Initial Decision recommending that Con Ed be granted a 50 year license for the project. On November 19, 1968, the proceedings were reopened in response to a petition by the City of New York to intervene and introduce evidence on possible hazards to its Catskill Aqueduct. At this proceeding, further evidence was taken on the alternative site in Palisades Interstate Park. The Hearing Examiner issued a Supplemental Initial Decision on December 23, 1969, which concluded that the project did not endanger the Aqueduct and that the alternative site was "not a proper and preferable alternative location for applicant's projected project." In all other respects, except for minor items,[5] the Initial Decision remained unchanged.
 
 
 33
 The proceedings on remand involved 100 hearing days, the testimony of some sixty expert witnesses, and the introduction of 675 exhibits. The record comprises more than 19,000 pages. Both the Hearing Examiner and the Commissioners arranged with the parties to visit the proposed site and the surrounding area before rendering their decisions.
 
 
 34
 On August 19, 1970, the Commission issued its decision. In its opinion the Commission reviewed the power needs of the area served by Con Ed and considered possible alternatives to the Storm King project in terms of reliability, cost, air and noise pollution, and overall environmental impact. Concluding that there was no satisfactory alternative, the Commission evaluated the environmental effects of the project itself. It held that the scenic impact would be minimal, that no historic site would be adversely affected, that the fish would be adequately protected and that the proposed park and scenic overlook would enhance recreational facilities. The Commission found that further undergrounding of transmission lines would result in unreliability in the delivery of power and would be too costly. The Commission determined that construction of the project would entail no appreciable hazard to the Aqueduct.[6]
 
 
 35
 We find that the proceedings of the Commission and its report meet the objections upon the basis of which we remanded the earlier determination. Examination of the Commission's conclusions and the evidence on which the conclusions are based establishes that the Commission has complied with our instructions and that the evidence supporting the Commission's conclusions amply meets the statutory requirement of substantiality.
 
 
 36
 A. "Alternative plans"
 
 
 37
 The Commission gave detailed and comprehensive consideration to alternatives. Its initial statement of the basic issues of the case before it and the manner of its subsequent dealing with those issues demonstrates that there is no sound basis for petitioners' contention that the Commission's approach was too narrow. The Commission said:
 
 
 38
 "The weighing of social values required by the concept of the public convenience and necessity in this case involves on the one hand the alleged greater and much needed reliability, economic savings, and anti-air pollution benefits which this project offers compared with any feasible alternative, and on the other hand the alleged aesthetic and environmental detriment the project would impose on an area of great scenic, natural and historic value.
 
 
 39
 Simply put, the issue is whether the project offers substantially more reliable electric service as well as cheaper electricity generated in a cleaner manner than any other feasible alternative and, if so, whether the project will create detrimental aesthetic and environmental conditions of such degree as to lead on balance to a judgment that the public convenience and necessity would be better served by denying the application herein."
 
 
 40
 In deciding this issue the Commission proceeded to evaluate the needs of Con Ed and the probability that the proposed project would supply these needs in a more desirable way than would the possible alternatives.
 
 
 41
 The Con Ed system serves the densely populated area of New York City's five boroughs and part of Westchester County. The electric load requirements that Con Ed must meet are constantly growing. The Commission found that in 1970 Con Ed's capacity would be approximately 10,126 mw, plus 520 mw contracted from other utilities. However, much of the system is outdated and about 2,000 mw of its present capacity are due to be eliminated by 1978. And yet by 1979, Con Edison's annual peak load[7] will be approximately 10,850 mw.
 
 
 42
 Two factors were cited by the Commission as necessary to insure availability of the required amount of energy and to prevent major power failures, such as that which occurred in the northeast United States in 1965, as well as the lesser "brownouts" and "blackouts" which have become all too frequent in the New York area. The first of these two factors is the existence of adequate power facilities to meet the growing demand for electrical energy in the area served. The second is an adequate "reserve," a part of which must be what is called a "spinning reserve."[8] This "spinning reserve" is provided by units operating at less than full capacity but synchronized to the system so that the energy generated by them will all be immediately available to meet an increase in loads. It is this latter need that the Storm King project is designed to meet.
 
 
 43
 The Commission found that in order to prevent a major power failure the "spinning reserve" must be fully available within two minutes.[9] The Commission expressed the opinion, based on the record before it, that "if Cornwall or a pumped storage equivalent with its very fast pick-up characteristics had been available the blackout of 1965 might have been avoided."
 
 
 44
 The Commission examined in detail the possibility that there were alternatives more desirable than the Storm King project which would be capable of meeting these needs. Our earlier opinion required the Commission to consider the use of gas turbines. The Commission determined that using gas turbines alone would not be a feasible alternative to a pumped storage unit since the turbines would be less reliable and more expensive. Gas turbines, the Commission found, take between three minutes and ten seconds and four minutes to be brought to full operation from a cold start. Moreover, the Commission stated, unlike pumped storage units, gas turbines have a relatively low capacity for storage of rotational energy, and thus do not provide as substantial a cushioning effect in the event of a disturbance.
 
 
 45
 Gas turbines were found to be considerably more expensive to operate than pumped storage units. The Commission adopted the conclusion of a staff study that the operating costs of a pumped storage project would be at least $119,000,000 less over a twenty-year period than the operating costs of gas turbines.[10] It would cost about $38,000,000 less, the study estimated, to construct the pumped storage project than to provide the gas turbines.
 
 
 46
 The Commission also considered the possibilities of a project composed entirely of nuclear units but found that such an alternative would be inadequate for reasons which are fully developed in the report. The Commission was of the opinion that a nuclear-gas turbine combination[11]
 
 
 47
 "suffers from the shortcomings inherent in its components, that is, unless the gas turbines are spinning they cannot be brought into operation soon enough to meet emergencies and the nuclear component has relatively slow response characteristics which when combined with the forced outage reduces the reliability quotient of such a combination."
 
 
 48
 "[T]he reliability quotient of a nuclear-gas turbine combination," the Commission said, "is far less than Cornwall's."
 
 
 49
 The Commission estimated that construction of the nuclear-gas turbine alternative would cost $158,794,000 more than Cornwall. On the basis of these findings the Commission said:
 
 
 50
 "We do not accept the proposition put forth by Scenic Hudson that this extra cost is de minimis when spread among all of Con Ed's customers. There are often good reasons why it is in the public interest to utilize a more expensive alternative. In appropriate cases the extra cost may even be substantial. But whether substantial or not, the extra cost must be justified by a showing that the alternative is in the public interest. There has been no showing that a combination nucleargas turbine alternative offers any advantages or indeed is even reasonably equivalent to Cornwall."
 
 
 51
 The Commission also considered the feasibility of using power purchased from outside sources to supply Con Ed's needs as an alternative to building the Storm King plant. It found that the maximum amount that could be assured would be slightly in excess of 1000 mw.[12] Thus this alternative, the Commission held, would not provide sufficient power.
 
 
 52
 Petitioners do not suggest that interconnections alone could provide a feasible solution. Scenic Hudson proposed a combination of 810 mw of purchased power with gas turbines. However since the gas turbines in this combination would not be used to generate spinning reserves but to take on the load, the Commission found that this alternative would not serve the principal function for which the Storm King project is designed:
 
 
 53
 "In view of the assumption inherent in this suggestion by Scenic Hudson that the gas turbines would not operate as a spinning reserve, the spinning reserve would have to come from the purchase sources if this alternative is to be comparable to Cornwall. Accordingly this possibility cannot be deemed reliable, since such purchases would not be available in the event of a separation, the very time they would be most needed."
 
 
 54
 The Commission also examined the possibility of alternative sites for a pumped storage project. As the Commission points out, none of the petitioners offered any evidence on possible alternative hydro-electric sites. However, both Con Ed and the Commission staff conducted extensive surveys to determine if such alternatives existed within a hundred mile radius of New York City. Detailed studies for five such sites showed that they would be more costly and less reliable than the Cornwall project. All of them would require the construction of long transmission lines. For example, the Bashbish site, in New England, would require a transmission system of between 32 and 56 miles, with attendant effects on the surrounding land, as compared to the 9.2 miles of overhead corridor planned for the Cornwall project.
 
 
 55
 In its examination of alternatives the Commission considered their effect on air pollution, noise pollution and the overall environmental situation. Nuclear energy was found by the Commission to be the method of generation of electric power involving the least pollution. However since nuclear energy by itself is inadequate for peaking purposes, the effect on air pollution must be measured with relation to gas turbines, operating either as part of a nuclear-gas turbine system or operated partly loaded as spinning reserve. The Commission pointed out that the peaking energy generated at the Cornwall project is itself pollution free. Whatever pollution results from the operation of the project will be caused by the plants which supply the power for pumping the water into the reservoir. As the Commission said, "if the energy necessary to pump Cornwall comes from polluting power plants in New York City that would otherwise be idle, little or nothing would be gained in reducing the air pollution problem." The Commission concluded, however, that "water for Cornwall will normally be pumped by use of electric energy from non-polluting sources * * *." The Commission believed that construction of the Cornwall project would permit a more rapid replacement of old relatively inefficient steam-electric plants with large nuclear plants. Even during the early years of the project's operation, because pumping would take place during off-peak hours, i. e., at night, "clean-burning" natural gas would probably be available in amounts sufficient to meet a large part of the Cornwall requirements.
 
 
 56
 The Commission pointed out that proposed alternative methods of meeting Con Ed's need for power, since they too require construction of new facilities, would have an overall impact on the physical environment similar to that to which the opponents of the Cornwall project are objecting.
 
 
 57
 "Still another approach to weighing 'alternatives to the proposed action' from an environmental standpoint is to compare the operational consequence to the environment of the Cornwall project with similar consequences which would result from any reasonable alternative project. We conclude that none of the most likely proposed alternatives, including an all-nuclear unit or the mixed nuclear and gas turbine combination, could be sited within 100 miles of New York City with any less physical impact on the environmental aspects of the affected area than the Cornwall project."
 
 
 58
 B. "The conservation of natural resources, the maintenance of natural beauty, and the preservation of historic sites."
 
 
 59
 The Commission gave extended consideration to the environmental aspect of our remand order. Testimony was taken from "a veritable 'Who's Who' of conservation, each witness discussing a different facet of this esoteric and subjective matter." The Commission said: "[O]ur conclusion that the license must issue does not rest upon any discounting of the case made by the intervenors relating to the natural beauty, historical significance, and spiritual qualities of the Storm King Mountain in its setting." Its essential finding in this regard was that the Cornwall project, as modified by the Commission to make any structures not buried "as unobtrusive as ingenuity can make them," constitutes "no real impairment of the environmental and scenic aspects of the Highlands."
 
 
 60
 The original plan for the project provided for a powerhouse that would be 80 per cent underground. The project licensed by the Commission now calls for the powerhouse to be completely under-ground. While in an area visually part of Storm King Mountain, the powerhouse would not be under the mountain itself but in the Village of Cornwall "on a small river-bottom foothill." Scenic Hudson's witness Vincent J. Scully, professor of art and architecture at Yale University, although he was opposed to other features of the project, stated that the underground powerhouse itself did not "enter into the problem of visual relationship." The external features of the powerhouse site would all be located below the cut of Storm King Highway on the mountain.[13] The only features on the powerhouse site which would be aboverground would be the entrance to the underground plant, an access road, and the tailrace. The Commission said that "the land surface above the power station will be planted and as much of the existing growth as possible preserved."
 
 
 61
 The tailrace and abutments would be located at the river's edge, in an area partially occupied at present by a decidedly unscenic railroad bridge. The tailrace would be 685 feet long, with a vertical rock cut rising from 10 to 32 feet above the river. At the east end of the tailrace the visible height of the cut would be at most 20 feet above the existing railroad bridge. At the west end, the cut would be completely obscured by the existing bridge. The Commission pointed out that the "planting of vines on the rock face behind the tailrace would further serve to amelioriate the view from the river." With respect to the effect of the construction of the tailrace on the view of the mountain, the Commission said:
 
 
 62
 "The tailrace would be located where the river widens above the gorge and curves west by north, above the powerhouse. From the bank directly across the river the distance is 4000 feet. Because of the curved shoreline at that distance, at the river level there would be no direct view of the tailrace."
 
 
 63
 The tailrace and the vertical cut would not, therefore, destroy a scenic, unspoiled view of the mountain. They would in large part be hidden from view by existing man-made structures or natural phenomena. The scenic impact of that part of the tailrace and cut that would be visible are to be evaluated not in terms of the number of square feet potentially visible but in terms of the entire visible panorama. The total area that would be occupied would be minuscule in proportion to the total area encompassed within a viewer's peripheral vision. The Commission could reasonably find that with the river in the foreground and the mountain majestically rising 1343 feet behind, the tailrace and the vertical cut would not seriously impair the mountain's scenic aspects.
 
 The Commission found, in summary, that:
 
 64
 "Limiting the external features at the powerhouse site to the portal entrance, tailrace, and access road, totalling approximately 3 or 4 acres-out of Storm King's total of over 400 acres-should reduce to a minimum the visual impact on the scenic vistas of Storm King Mountain or the Highland Gorge of the Hudson River and thereby preclude any material scenic impairment or detriment."
 
 
 65
 The reservoir would not be on Storm King Mountain itself but behind the mountain from the river about two miles south and west of the powerhouse site, on lands owned in part by the Village of Cornwall and in part by Harvard University.[14] It would not be visible from the river; its visibility from other points "varies in relation to the elevation and distance of the view." From many of the points from which the reservoir can be seen various industrial developments can be seen as well.
 
 
 66
 The Commission found that, although the 240 acre reservoir will be larger than any of the other nearby bodies of water, "in the scale of the area it does not reasonably appear to dwarf the scene. Nor should it be materially different in appearance from ponds in the area and thus should not be deemed incongruous with the present character of the area."[15]
 
 
 67
 Finally with respect to the contention that the inside walls of mud, or rock fill, would be exposed as the reservoir rises and falls, the Commission found that the rock and earth comprising the dikes would not be out of character with the rock and bare spots common in the Highlands and that "[t]he plantings and natural growth which would adhere to the exterior and possibly interior surfaces of the dikes would also serve to ameliorate any intrusion of the reservoir and dikes on the natural scene."
 
 
 68
 The Commission's criticisms led to the substantial modification of the recreational aspects of the project. Con Ed's original proposal included an information center and recreation area to be located in the vicinity of the powerhouse site. These features were eliminated by the Commission. The Commission approved the construction of a riverfront park and a scenic overlook. The park is to be built on the rock excavated from the site of the power plant. It would be located in that part of the river to the north and west of the project adjacent to the shoreline. This 57 acre mile-long recreational facility, to be linked by two bridges to the Town of Cornwall to which it will be transferred upon completion, is to consist of play area, picnic sites, shelters, and sanitary facilities. The scenic overlook is to occupy a 36 acre tract abutting State Highway 9-W, and would also include picnic sites.[16] The Commission found that the overlook would enable visitors to enjoy "the scenic vistas of the Hudson River"[17] and "will not seriously or substantially impinge on the scenic historic or environmental qualities of the area."
 
 
 69
 The Commission heard extensive testimony on the effect of the project on historic sites in the area. There is no record that any event of historical significance took place at Cornwall or on Storm King Mountain. Constitution Island and West Point, and Forts Clinton and Montgomery, which are at Bear Mountain considerably below the project site, are the closest areas of historical importance. The project site is not visible from either Constitution Island or West Point. However, Constitution Island, which has the best preserved revolutionary fortification in the Highlands, will be visible from the proposed scenic overlook. None of the parties has offered any specific rebuttal to the Commission's conclusion that "the project will not cause the destruction of any historical site."[18]
 
 
 70
 The thrust of petitioners' arguments is that the principle of preservation of scenic beauty permits of no intrusion at all into this area and that, therefore, no power plant, no matter how innocuous, may be built. This is clearly a policy determination which, whatever may be our personal views, we do not have the power to impose on the Commission. The Commission has complied with the terms of our remand by giving careful and thorough consideration to the impact of the project on the environment. The conclusions it has reached are supported by substantial evidence.
 
 
 71
 C. The "fisheries question."
 
 
 72
 In our remand order, in addition to requiring further consideration of the overall environmental impact of the project, we specifically directed the Commission to "take the whole fisheries question into consideration before deciding whether the Storm King Project is to be licensed." Scenic Hudson, supra at 624, of 354 F.2d. We had in mind the allegations of fishermen's groups that the project threatened to destroy the eggs of the striped bass whose major spawning grounds, they maintained, are in the immediate vicinity of the project, and "that 'no screening device presently feasible would adequately protect these early stages of fish life' and that their loss would ultimately destroy the economically valuable fisheries." Id.
 
 
 73
 The Commission took official notice of the report of the Hudson River Policy Committee entitled "Hudson River Fisheries Investigations 1965-1968," which was based upon a study sponsored by the New York State Conservation Department and the United States Fish and Wildlife Service and conducted under the field direction of a technical advisor of the United States Bureau of Sport Fisheries.
 
 
 74
 The "Hudson River Fisheries Investigations" concluded that:
 
 
 75
 "* * * the evidence indicates that there would not be any significant adverse effects to the striped bass and American shad fisheries of the Hudson River from a pumped storage generating plant at Cornwall, New York."
 
 
 76
 The Policy Committee's study lends strong support to the views presented by a number of witnesses at the hearings to the effect that the spawning grounds of striped bass extend from locations at river mile 35 to river mile 123, and that these spawning grounds are, in the Commission's words, "not consistently more favorable in one location than another." The Commission found "that bass spawn substantially in the Hudson River over an 80 mile reach, including the Cornwall area, and that no part thereof is distinguished as a major spawning area."
 
 
 77
 The devices originally proposed to protect the fish have been redesigned to afford greater protection. Referring to the testimony of a fishery biologist from the Commission staff, the Commission said:
 
 
 78
 "* * * that while the mortality rates of fish, fish eggs, and larvae inhabiting the water which will be drawn through the screen and the plant cannot be measured short of actual measurement during project operation, in his own opinion the losses to the fishery caused by the operation of the project would not significantly affect the Hudson River fishery resources."
 
 
 79
 In order to compensate for the loss of fish resulting from the operation of the proposed plant, Con Ed proposed, and the Commission approved, construction of a fish hatchery.
 
 The Commission concluded:
 
 80
 "Witness Raney's fear[19] as to what might or could happen [is] counter-balanced by testimony based on sampling studies which relating egg producing capacity of the striped bass to volumes of water in plant operation indicates that the impact on Hudson fishery would not be substantial. Thus even if none of the fish and eggs at Cornwall survived, the total impact would be small. The evidence, however, is to the effect that no such disaster would befall the Cornwall segment. Eggs, larvae and fish entering the plant would have a survival rate in the area of 80 per cent. Further, hatchery operations elsewhere indicate the feasibility of an operation in the Hudson which would be capable of replacing any losses attributable to the project."
 
 
 81
 *****
 
 
 82
 * * *
 
 
 83
 D. The "aesthetic advantages of underground transmission lines against the economic disadvantages" and related routing problems.
 
 
 84
 In compliance with our mandate, the Commission investigated the possibility of constructing the transmission lines of the project entirely underground. The Commission weighed the obvious aesthetic advantage of underground transmission as against its economic and functional disadvantages.
 
 
 85
 The evidence shows that putting the transmission lines underground would cost substantially more than having them overhead. The Commission's staff estimated that considering both construction and maintenance costs, underground lines would be approximately 16 times as expensive as overhead lines. The Commission explained that:
 
 
 86
 "The relative costs of undergrounding can be appreciated from the fact that the problems inherent in transmitting power underground at high voltages are not simply a matter of putting an overhead transmission line, which is merely a bare insulated piece of metal conductor, into a trench. The phenomena of heat buildup and condenser (or capacitance) effect require that underground cables be an entirely different species of equipment."
 
 
 87
 The Commission cited a number of technological factors that result in higher labor and material costs for undergrounding. Underground cable requires a type of insulation which can be applied only by highly skilled labor. Transmission of power by underground lines presents problems which can be solved only by the installation of large magnet-type coils every 2 to 3 miles. Various other expensive techniques, such as intricate splicing, are needed to meet other problems presented by the electrical and thermal properties of underground lines.
 
 
 88
 The Commission found that there were functional disadvantages in underground cables. Although overhead lines have more outages, there can generally be immediate automatic reclosure with no disruption of service. Outages in underground cables, on the other hand, result in considerably greater disruption of service since the failure must be located, the damaged area excavated, and complicated repairs made.
 
 
 89
 The Commission, balancing the several factors which are involved, concluded:
 
 
 90
 "It is thus apparent that only for the most cogent reasons, as where no feasible alternative is possible or where the aesthetic detriment is so violent as to preclude any consideration of overhead transmission facilities, that undergrounding should be required.
 
 
 91
 ******
 
 
 92
 * * *
 
 
 93
 Nor do we believe it is in the public interest to burden consumers with the cost of undergrounding cables unless it were necessary to prevent such destruction or serious damage."
 
 
 94
 The transmission route which is now approved is different from the route challenged before this court in 1965. The new route is not the route preferred by Con Ed, but is a modified route developed by the Commission staff. Although it is 5 to 6 miles longer than the route proposed by Con Ed, it would require 4 miles less of transmission corridor because it uses a greater length of the existing Pleasant Valley-Millwood corridor. The alternative route was selected because "it will impinge less on the area through which it passes than would any other route." The area traversed is "rough, wooded and hilly. More importantly, its valleys lie in a north-easterly direction and are oriented so as to provide the possibility of locating lines below crests." The wooded nature of the area will provide natural screening. The Commission found that "the area will remain what it is now-scenic and pleasant, with open farmland and orchards and partly wooded with some brooks. To say that this will be seriously damaged or destroyed by an overhead transmission line is not consistent with reality."[20]
 
 
 95
 Since the Commission's conclusions on this issue are based upon consideration of all relevant factors and are supported by substantial evidence, they cannot be rejected.
 
 E. The Catskill Aqueduct
 
 96
 The issue of possible danger to New York City's Catskill Aqueduct was not involved in the earlier proceeding. It is presented in the new application because of the change in the Cornwall project to provide for construction of the powerhouse completely underground. As a consequence of that change the powerhouse is to be located at its closest point a distance of about 140 feet from the Moodna Pressure Tunnel, a link in the Catskill Aqueduct system. The Catskill system is one of three systems that supply New York City with substantially all of its water. Twenty-odd communities in upstate counties also have the right to, and do tap the Catskill Aqueduct.
 
 
 97
 The city contends that the Cornwall project interferes with its control of the Catskill Aqueduct and is therefore precluded by Section 27 of the Federal Power Act, 16 U.S.C. Sec. 821 (1964), which provides that:
 
 
 98
 "Nothing contained in this chapter shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective States relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein."
 
 
 99
 The argument based on Section 27 is without merit. The license that the Commission has issued does not authorize Con Ed to divert any of the city's water or to interfere with the tunnel. Moreover the "only purpose of section 27 is to preserve to holders of state-conferred water rights a right to compensation if those rights are taken or destroyed as an incident to the exercise by another, of a license granted by the Commission." Portland General Electric Co. v. Federal Power Commission, 328 F.2d 165, 176, & n. 23 (9th Cir. 1964), citing City of Fresno v. California, 372 U.S. 627, 629-30, 83 S.Ct. 996, 10 L.Ed.2d 28 (1963) and Ivanhoe Irrigation District v. McCracken, 357 U.S. 275, 291, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958), both of which involved the very similar language of Section 8 of the Reclamation Act of 1902, 43 U.S.C. Sec. 383 (1964).[21] Section 27 was not intended to give the city the power to veto Commission action.
 
 
 100
 The Commission concluded that excavation of the powerhouse site would not cause damage to the Moodna Pressure Tunnel, that controlled blasting during construction would not endanger the Aqueduct and, generally, that "the probability of damage to the Aqueduct is remote." We think that there is substantial evidence in the record to support the Commission's determination.
 
 
 101
 The Commission found that the rock underlying the project "is a very large mass of dense uniform crystalline rock underlain by sedimental rock capable of sustaining great loads." The city contends that, on the contrary, instability of the rock at the Aqueduct site can be deduced from a failure of the original Moodna Tunnel in 1913 and by the phenomenon of "popping rock" encountered in construction of the tunnel. However, the evidence shows that the failure of the original Moodna Tunnel was due to excessive water pressure and insufficient rock cover. The tunnel was corrected by construction of an alternate shaft and has operated for a period of over 50 years without untoward incident. The Commission found that "[t]he phenomenon of 'popping rock' occurs in rock of this area only at depths below 1,000 feet," far below the depth proposed for the Cornwall project.
 
 
 102
 Although witnesses for the City testified that stress changes caused by the powerhouse excavation and by blasting might present hazards to the Aqueduct,[22] other witnesses seriously disputed these contentions. Smith, a consulting geologist for Con Ed, testified, as the Commission said, "that he could conceive of no possible condition in this area which would make the proposed plan hazardous from a geological point of view." Dr. Bartlett W. Paulding, Jr., Associate Professor and Acting Head of the Basic Engineering Department of the Colorado School of Mines, who was retained by Con Ed at the suggestion of the City, testified that the effect of excavations on the aqueduct would be insignificant. Dr. Paulding, whom the Commission described as "a geologist and geophysicist specializing in rock mechanics," concluded, in the Commission's words
 
 
 103
 "that the absence of adverse geological conditions, coupled with the results of a photoelastic analysis of the stress conditions around rectangular openings * * * indicate that the existing Catskill Aqueduct will not be endangered * * * during * * * excavation for the power plant."
 
 
 104
 Similar testimony was offered by Charles P. Benziger who based his conclusion on low stress conditions at the site as shown by seismic tests in drilled holes at the point where the power station is to be located.
 
 
 105
 The Commission's conclusion that blasting would pose at most a remote possibility of damage has ample support in the record. The city's own witness, Don Deere, testified that it was "possible, but unlikely that blasting, if restricted and properly controlled, will cause damage to the pressure tunnel." Another of the city's witnesses, Malcolm T. Want, testified that the effects of blasting are somewhat conjectural. Con Ed's witness Paulding testified that the Aqueduct would not be endangered if blasting charges were limited to 55 pounds per charge. The Commission's conclusion that properly controlled blasting presented at most a "remote" danger is not seriously challenged by the city.
 
 
 106
 It is clear that the resolution of highly complex technological issues such as these was entrusted by Congress to the Commission and not to the courts. Where the Commission's conclusions are supported by substantial evidence, the courts must accept them. It seems to us that it would be very difficult indeed to argue that the evidence supporting the Commission's determination with respect to the Aqueduct is insubstantial. In fact the argument presented to us on this issue appears to be either that some higher burden of proof should be imposed with respect to the matter or that the city should be able to exercise what, in effect, amounts to a veto power. However, there is no authority whatever to support the imposition of any greater burden of proof than that provided in the statutory standard and "[s]uch a veto power easily could destroy the effectiveness of the federal act. It would subordinate to the control of the [city] the 'comprehensive' planning which the Act provides shall depend upon the judgment of the Federal Power Commission or other representatives of the Federal Government." First Iowa Hydro-Electric Cooperative v. Federal Power Commission, 328 U.S. 152, 164, 66 S.Ct. 906, 912, 90 L.Ed. 1143 (1946) (footnote omitted).
 
 III.
 
 107
 The only remaining concern is the allegation that the Commission failed to comply with certain statutory directives.
 
 
 108
 The first of these statutes is Section 10(a) of the Federal Power Act, 16 U.S.C. Sec. 803(a) (1964 & Supp. 1971) which provides:
 
 
 109
 "Sec. 803. Conditions of license generally.
 
 
 110
 All licenses issued under sections 792, 793, 795-818, and 820-823 of this title shall be on the following conditions:
 
 
 111
 ******
 
 
 112
 * * *
 
 
 113
 (a) That the project adopted * * * shall be such as in the judgment of the Commission will be best adapted to a comprehensive plan for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, for the improvement and utilization of waterpower development, and for other beneficial public uses, including recreational purposes; and if necessary in order to secure such plan the Commission shall have authority to require the modification of any project and of the plans and specifications of the project works before approval."
 
 
 114
 This is the statute upon which, to a large extent, our earlier remand was based. In our opinion we said that the phrase "recreational purposes" "undoubtedly encompasses the conservation of natural resources, the maintenance of natural beauty, and the preservation of historic sites." Scenic Hudson, supra at 614 of 354 F.2d. We directed the Commission to consider all of these factors in reaching its decision.
 
 
 115
 It is obvious that in finding compliance with our remand order, we also find compliance with the statute on which that order was based. As we have pointed out, the Commission has given careful and thorough consideration to "recreational purposes," and, indeed, has used its "authority to require the modification of [the] project" in a number of aspects related to this end.
 
 
 116
 There is no real dispute as to other findings required by the statute. The Commission found that there would be no impediment to navigation, that use of the Hudson River for electric generation by this project is "well adapted to development of the waterway for the use or benefit of interstate or foreign commerce," and that the project will not interfere with any future program for the river since it will discharge no chemical, thermal or solid pollutants into the waterway. In short, the Commission has given full consideration to all of the statutory factors and has thus performed the "specific planning responsibility" entrusted to it by Congress in Section 10(a).
 
 
 117
 The petitioners also claim that the Commission has violated the National Environmental Policy Act, 42 U.S.C. Sec. 4321 et seq. (Supp.1971). This Act was passed after the close of the hearing, but before the Commission's decision.[23] Its applicability to this proceeding is clear, and is conceded. See Zabel v. Tabb, 430 F.2d 199, 213 (5th Cir. 1970), cert. denied, 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1971). Section 101 "recognizing * * * the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man" requires the federal government to
 
 
 118
 "(b) * * * use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may-
 
 
 119
 ******
 
 
 120
 * * *
 
 
 121
 (4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, whenever possible, an environment which supports diversity and variety of individual choice;
 
 
 122
 (5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities. * * *" 42 U.S.C. Sec. 4331 (Supp.1971).
 
 
 123
 Section 102 of the Act, 42 U.S.C. Sec. 4332 (Supp.1971), requires agencies of the federal government to take certain prescribed measures.
 
 
 124
 The policy statement in Section 101 envisions the very type of full consideration and balancing of various factors which we, by our remand order, required the Commission to undertake. Like our remand, the Act does not require that a particular decision be reached but only that all factors be fully explored. The eventual decision still remains the duty of the responsible agency.
 
 
 125
 The Commission has complied with the specific directives contained in Section 102 of the Act. The hearings reflected the "systematic, interdisciplinary approach" required by that section. The Commission consulted with other agencies, as required by Section 102, including the Chief of Engineers, the Advisory Council on Historic Preservation, the Department of the Interior, the Atomic Energy Commission and a number of state and local groups that stand to be affected. The environmental statement required by Section 102(2) (C) of the Act, 42 U.S.C. Sec. 4332(2) (C) (Supp.1971) was submitted in the form of the Commission's opinion. In view of the exhaustive environmental findings which occupy a substantial portion of the Commission's opinion, and the Commission's explicit conformance with the enumerated portions of the required statement, we conclude that full compliance with the National Environmental Policy has been demonstrated.
 
 IV.
 
 126
 We do not consider that the five years of additional investigation which followed our remand were spent in vain. The petitioners performed a valuable service in that earlier case, and later before the Commission. By reason of their efforts the Commission has reevaluated the entire Cornwall project. The modifications in the project reflect a heightened awareness of the conflict between utilitarian and aesthetic needs. Whether the project as it now stands represents a perfect balance of these needs is not for this court to decide. Since the Commission has fully performed the duties and responsibilities imposed upon it, it is our obligation to deny the petitions in all respects.
 
 OAKES, Circuit Judge (dissenting):
 
 127
 If this case came to us without environmental overtones and with no threat to the water supply of the largest city in the United States, I would be constrained to take the viewpoint of the majority. For, whether or not I agreed with the weight given by the Federal Power Commission to alternative sources of power, such as the purchase of Canadian energy,[1] the court would be conclusively bound, both under Section 313(b) of the Federal Power Act, 16 U.S.C. Sec. 825l(b), and the case law, e. g., Gainesville Utilities Dep't v. Florida Power Corp., 402 U.S. 515, 91 S.Ct. 1592, 29 L.Ed.2d 74 (1971), by findings supported by "substantial evidence," particularly when the Commission is acting within its own field of "expertise and judgment" Gainesville, supra, 91 S.Ct. at 1598. It is also true, of course, that the courts cannot quarrel with the Congressional policy impliedly expressed in Sections 207 and 311 of the Federal Power Act, that puts great emphasis on "adequate service," 16 U.S.C. Sec. 824f, the "cost of generation * * *" and "the development of navigation, industry, commerce, and the national defense," 16 U.S.C. Sec. 825j.[2]
 
 
 128
 On the other hand Congress has now placed a measure of responsibility with the FPC, and the other federal agencies, to take environmental factors into account.[3] The FPC also has its own duties, specified in Section 10(a) of the Federal Power Act, 16 U.S.C. Sec. 803(a), to issue a license to use water power only when the project will be best adapted for "beneficial public uses, including recreational purposes." And indeed as Judge Learned Hand once put it, although in reference to agency interpretation of statutes:
 
 
 129
 In spite of the plenitude of discussion in recent years as to how far courts must defer to the rulings of an administrative tribunal, it is doubtful whether in the end one can say more than that there comes a point at which the courts must form their own conclusions. Before doing so they will, of course,-like the administrative tribunals themselves-look for light from every quarter, and after all crannies have been searched, will yield to the administrative interpretation in all doubtful cases; but they can never abdicate. Niagara Falls Power Co., v. FPC, 137 F.2d 787, 792 (2d Cir. 1943).
 
 
 130
 I take it also that we cannot abdicate when the Commission fails "to make findings or evaluate considerations relevant to its determination." Gainesville Utilities Dep't v. Florida Power Corp., supra, 91 S.Ct. at 1598 n. 7; and see Schaffer Transportation Co. v. United States, 355 U.S. 83, 78 S.Ct. 173, 2 L.Ed.2d 117 (1957); Scenic Hudson Preservation Conference v. FPC, 354 F.2d 608 (2d Cir. 1965), cert. denied, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966). Similarly, if the agency findings are internally inconsistent, the court is not bound to accept them. Cf. Gallick v. Baltimore & Ohio R. Co., 372 U.S. 108, 119, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963); Telex Corp. v. Balch, 382 F.2d 211, 215 (8th Cir. 1967); Freightways, Inc. v. Stafford, 217 F.2d 831, 835 (8th Cir. 1955); Williams v. United States, 126 F.2d 129, 132-133 (7th Cir.), cert. denied, 317 U.S. 655, 63 S.Ct. 52, 87 L.Ed. 527 (1942). Finally, while judicial deference to administrative expertise is required, not every agency is expert in every aspect of science, technology, aesthetics or human behavior. Cf. Universal Camera Corp. v. NLRB, 340 U.S. 474, 476, 71 S.Ct. 456, 95 L.Ed. 456 (1951); see L. Jaffe, Judicial Control of Administrative Action 576 et seq. (1965). As Professor Jaffe has said, "* * * expertness is not a magic wand which can be indiscriminately waved over the corpus of an agency's findings to preserve them from review." Id. at 613; see also 4 K. Davis, Administrative Law Treatise Sec. 30.07 (1958).
 
 
 131
 With these considerations in mind, I dissent. I dissent because I think the FPC acted arbitrarily, abusing its discretion while purporting to act under the mandate of this court in Scenic Hudson, supra; because its findings in respect to the Catskill Aqueduct are inconsistent and insufficient; because its findings as to the effect of the project upon New York City air pollution are incomplete and fail to take into account relevant factors; and because the Commission's findings and conclusions show that it has not really followed the mandates of the National Environmental Policy Act of 1969, Pub.L. 91-190 (Jan. 1, 1970), 42 U.S.C. Secs. 4321-4347.
 
 
 132
 The City of New York has pointed out, in opposition to the license granted by the FPC, that the Storm King (some-times called "Cornwall") project powerhouse is proposed to be built only 140 feet from the Moodna Tunnel section of the Catskill Aqueduct. This aqueduct is one of three systems supplying water to New York City. It is a gravity-flow aqueduct over 50 years old, conveying approximately 40 per cent of the city's average daily water supply from the Ashokan Reservoir, 100 miles north of the city to the Kensico Reservoir, 15 miles north of the city line. Those who may remember the effects of severe droughts in the 1940's and the 1960's on the New York City water supply must realize the importance of such a vast quantity of water to the city, and imagine the consequences of its disruption.[4]
 
 
 133
 The Moodna Pressure Tunnel begins at a downtake shaft some five miles westerly of the Hudson River, set in the rock of Storm King Mountain. Lined with concrete, it tunnels through the mountain at an elevation of minus 220 feet until it is 900 feet from the river; there it descends to an elevation of minus 616 feet to the river. From this point water continues to flow under pressure at 1100 feet below the Hudson River through the Hudson Pressure Tunnel and then connects to an uptake shaft on the east side of the River, surfacing at Breakneck Ridge. This whole complex of tunnels by which the Aqueduct crosses the Hudson is known as the Moodna-Hudson-Breakneck Pressure Tunnel. It has had a continuous water flow since it broke down and was repaired in 1913[5]; consequently it has not been inspected since then. In a "pressure" tunnel, hydrostatic pressure is constantly maintained. The City, aware of the risk to its water supply from drilling, in its deed of Storm King land to the Palisades Interstate Park Commission, included a protective covenant to ban drilling within 200 feet of the Aqueduct.[6] When Consolidated Edison first proposed in 1963 to build a powerhouse some 175 feet from the Aqueduct the City objected and in the original Consolidated Edison project turned down in Scenic Hudson, supra, the proposed power house was moved some 400 feet to meet the City's objection.[7] At the hearings below the City presented two experienced engineers, Professor Malcolm T. Wane, with experience in mine design and rock mechanics and with mine failures due to stress conditions, and Dr. Don U. Deere, a professor of engineering and geology familiar with the major pump storage projects at Yard's Creek, Northfield Mountain and Churchill Falls. Dr. Deere concluded, on the basis that the Consolidated Edison excavation would cause an estimated 31 per cent increase in tangential stresses at the top and bottom of the tunnel and a decrease of 50 per cent on the sides, that there is "a small, but real" risk to the Aqueduct from the project. Dr. Deere pointed out that the degree of risk is unknown:
 
 
 134
 *****
 
 
 135
 * * *
 
 
 136
 *****
 
 
 137
 * * *
 
 
 138
 Moreover, considering for the moment that the precise magnitude of the stress changes around the tunnel were accurately known, the effect of these stresses on stability of the tunnel lining and adjacent rock, i. e., the factor of safety, could still not be determined because neither the strength of the lining in its present condition nor of the adjacent jointed and fractured rock mass is even approximately known. Deere, 124/18,577-78.*
 
 
 139
 He was joined in this conclusion by Dr. Wane:
 
 
 140
 One of the outstanding features of the whole problem is a lack of specific knowledge of what exists at this site * * * [since] we do not know anything about the state of nature in the immediate neighborhood of the aqueduct. Wane, 124/18,550-51.
 
 
 141
 Consolidated Edison's chief witness, Dr. Bartlett Paulding, a geologist who had done no work on tunnels or underground excavations, testified that on the basis of a "photo-elastic" technique his estimate of radial stress changes around the Aqueduct resulting from the powerhouse excavation would come to only 11 per cent, and that this meant that the excavation would not significantly affect the existing Aqueduct. Paulding, 112/17,203. Professor Wane significantly indicated that the photo-elastic method, while sound as far as it goes, only accounts for the unloading or vertical effect of excavation, not for the horizontal effects.
 
 
 142
 I do not take it that there is any particular FPC expertise in geology, and particularly the effect of unloading, that is, relief of rock stress by excavation, on pressure aqueduct tunnels. In answer to a question on oral argument along this line, the FPC assured the court that its staff had some knowledge and expertise. If this be so, one may wonder why the commission did not follow the recommendations of its staff that "an appropriate precautionary measure should be undertaken by the Applicant to safeguard the Moodna Tunnel Section of the Catskill Aqueduct."[8]
 
 
 143
 Several of the commission's own "findings" on the danger to the Aqueduct tend to support the City's position and not the applicant's, and most of the commission's findings on the Aqueduct are couched in terms of uncertainty. For example, in Finding 270 reference is made to the city's witness Fluhr and mention is made of his testimony that "there is certainly some risk," but the commission never tells us what this risk is or indeed whether the commission finds any risk. Again, Finding 271 refers to the former leaking of the Aqueduct necessitating its closing down during construction in 1913 and goes on to say, "any large open joints connecting the bypass[9] and aqueduct could be grouted off if the experience of the original construction is typical." The commission, however, does not tell us whether it is likely that "the experience of the original construction" will be "typical" or just how this grouting would be accomplished. Indeed, one surmises that to accomplish any grouting the Aqueduct would have to be shut down, and that this might impair the integrity of the Aqueduct.
 
 
 144
 The Findings fail to convince me that there is no substantial risk to the Aqueduct. Finding 272 says that the operation of the Aqueduct for over fifty years indicates that it can withstand all of the hydrostatic pressures and stresses involved in the construction at Cornwall. But how such operation can establish this is not indicated, since even on the Consolidated Edison evidence there will be new and changed stresses resulting from drilling and blasting for the power-house excavation.
 
 
 145
 In Finding 284 the commission states that "[t]he evidence, thus, reasonably is to the effect that the probability of damage by reason of blasting is remote" (italics supplied). But Footnote 25 to Finding 287 says "[t]here is no evidence concerning the condition of the Aqueduct's lining. Its structural integrity is unknown to the city or any of its witnesses."
 
 
 146
 The mere recitation of testimony by the Federal Power Commission does not amount to the making of findings.[10] The comment above in Footnote 25 to Finding 287 is revealing, moreover, in that it seems to imply that there is some duty on the part of the City to make a substantial showing that the Aqueduct will break. If the structural integrity is unknown to the City or any of its witnesses, presumably it is also unknown to the commission and to Consolidated Edison's witnesses. The burden is not on the City to prove that the Aqueduct will not break, but on the applicant to prove and the commission to find no danger to public "life, health and property."[11] The commission's reliance in its Footnote to Finding 287 on trouble-free operation for fifty years under entirely different circumstances seems to me insufficient to support the required finding of safety.
 
 
 147
 Finding 290 contains the conclusion "that the evidence in the record indicates that the probability of damage to the aqueduct is remote and that a by-pass is not required." Even if this in and of itself be supported by the evidence, Finding 295 that "construction of the powerhouse will not endanger the aqueduct" is inconsistent with it and not based on the evidence: there is a world of difference between no danger and a "remote" danger. If a danger is "remote" the degree of "remoteness" assumes importance in proportion to the magnitude of the danger. Here the danger is obviously great, and there is no finding as to the degree of remoteness.
 
 
 148
 The commission's Added Findings 33 and 34 are not based upon the earlier findings and in turn are not based on the evidence when they say (1) that the construction will not constitute a hazard to the Aqueduct and (2) that the site does not constitute a hazard to the Aqueduct.
 
 
 149
 The most compelling statement in the record evaluating the problem is that of City's witness Thomas W. Fluhr, an engineering geologist who is a consultant for the City of New York Board of Water Supply:
 
 
 150
 The geologic risk is that during construction of the project or during construction of the proposed bypass, stresses already present in the rock may be triggered and cause failure of the aqueduct. Moreover, even if the bypass were successfully constructed and placed in operation, and the pumpgenerator and transformer galleries also completed, there would be no assurance that orogenic stresses would not build up and cause failure of the aqueduct even after a lapse of many years.
 
 
 151
 ******
 
 
 152
 * * *
 
 
 153
 The risk of failure of the aqueduct cannot be regarded as imminent but it represents a definite hazard. When the Moodna Tunnel was first constructed and failed, ample time was available to rebuild it since there were no consumers dependent on it for water supply. At present there is no substitute for the Catskill Aqueduct; Its failure could have catastrophic consequences.
 
 
 154
 Evaluation of the risk involved in constructing the power plant near the aqueduct tunnel cannot be made on an actuarial basis. The risk might be taken as a calculated business risk if only money were involved; however, a failure of this water supply system might jeopardize the lives and welfare of millions of persons in the city and the upstate communities served by the Catskill Aqueduct. Fluhr, 110/16,837-38.[12]
 
 
 155
 On this record and on the commission's findings and in the light of the commission's own staff recommendation, I would dissent as to the Storm King site even if the aqueduct were the only factor involved. But there are other points on which it seems to me the commission was only paying lip service to the mandate of this court in Scenic Hudson, supra.
 
 
 156
 The first of these is air pollution.[13] While the extent to which the FPC possesses any particular expertise on air pollution may be doubted, we may assume some familiarity with the subject in the light of the commission's comments in, and experience in preparing, the 1970 National Power Survey.[14] Unfortunately, one generating plant after another has been constructed in the past without much attention to this problem[15]-one that by contrast is perhaps more readily visible for a visitor to New York than it may be to full-time citizens of the city.[16] The Cornwall project as an alternative to other generating methods on its face is more conducive to eliminating air pollution, except for one catch: in order to pump water from the river to the reservoir at Cornwall, Consolidated Edison may, as the commission order now reads, pollute the city during pumping hours, which are usually at night,[17] when the air is most still and the pollutants sit low over the city. In other words, there is no requirement that Consolidated Edison refrain from using its present generating facilities for pumping purposes; most of those facilities are, according to the commission's Finding 82, relatively inefficient and burn relatively expensive, depletable fossil fuels, and some of them are outmoded.[18]
 
 
 157
 Since by FPC calculations it will take 1.4 KWH of pumping energy supplied during non-peak periods to produce 1 KWH of project energy, Finding 71, it is obvious that additional air pollution will result if the pumping energy comes from those old fossil fuel plants.[19] If, as Finding 83 says, "[v]ery little city generated power will be used to pump Cornwall, particularly as Con Ed's inter-connections and nuclear generated capacity increase with time," why would it not be proper to order that only the most efficient and least polluting fossil fuel generating units be utilized for pumping purposes now?[20] Indeed, Finding 84[21] seems to suggest that gas plants will be used for pumping but the order does not require their use. Of course, it may be that Consolidated Edison will be prohibited from using its old fossil fuel plants for pumping or otherwise under the Clean Air Amendments of 1970[22] to the Clean Air Act, 42 U.S.C. Secs. 1857-1857l. But this does not absolve the FPC of its responsibilities to avoid adding to air pollution under its own governing Act or under NEPA, supra, note 3. Consolidated Edison's own studies made in 1966-67 show that Storm King will result in more fossil fuel usage in New York than would certain other alternatives. While this study has been questioned by the FPC itself, one of the justifications made by the company for the Storm King plant has been that it would permit otherwise idle large base-load plants in the city to generate at night.
 
 
 158
 Our customers' demands for electricity are high when they are awake and at work. Conversely, during the night time when most are sleeping, their need for electricity is at a low level-much below the capability of our most modern and efficient generating capacity. We plan to use this otherwise idle but efficient capacity to pump and store water in the upper reservoir at times of light customer demand. 32/4191.
 
 
 159
 Beyond this, we are told that Consolidated Edison generating facilities in the City produced 113,700 tons of nitrogen oxides, constituting about 38 per cent of total emissions of those compounds in the City.[23] Yet there is no mention of these in the Commission findings, except perhaps by implication in Finding 76.[24] To my mind, remand is required not only on the strength of the present record and Scenic Hudson, supra, for insufficiency of findings, but also in view of the changes which have occurred in Congressional policy on air pollution control,[25] and in plans to eliminate air pollution in New York City.[26] It is no answer to say that the City may invoke its own police power, if necessary, to regulate the dispersions from Consolidated Edison fossil fuel plants; Consolidated Edison would be the first to cite, indeed it already relies upon, First Iowa Hydro-electric Coop. v. FPC, 328 U.S. 152, 66 S.Ct. 906, 90 L.Ed. 1143 (1946), to avoid undue inhibition of its rights under any license granted for Storm King.
 
 
 160
 The final matters which, to my mind, tip the scales for a reversal rather than simply a reversal and remand are two. The first concerns what may broadly be called aesthetics,[27] impairment by the project of the mountain's scenic grandeur. The commission's Finding 148 refers to the mountain "swallow[ing]" the "scar of the highway, the intrusive railroad structure and fills and tolerat[ing] both the barges and scows which pass by it and the thoughtless humans [sic] who visit it without seeing it * * *." The finding goes on to say that just as the mountain swallows present day intrusions, "it will swallow the structures which will serve the needs of people for electric power." This argument borders on the outrageous; it can be used to justify every intrusion on nature from strip mining to ocean oil spills, viz., "the Santa Barbara coastline already has an ocean-side highway, numerous offshore oil rigs, and a lot of flotsam and jetsam comes on to the beaches, etc. * * *." Two scenic wrongs do not necessarily make a right. On the basis of the commission's thesis, wherever you have one billboard you can put two, wherever you have one overhead transmission line you can put another, you can add blight to blight to blight. That a responsible federal agency should advance that proposition in the form of a finding and in the teeth of the NEPA seems to me shocking. The commission's finding overlooks the fact that we are considering here a power station which above ground will consist of a concrete tailrace with abutments 32 feet high and 685 feet long, cutting back existing shore line from 195 to 260 feet,[28] exclusive of any access road.[29] This location, as the commission concedes, is on a small riverbottom foothill which "is visually a part of Storm King Mountain * * *."[30] The mountain may "swallow" the project, but the concrete tailrace and abutments, as long as a good-sized football stadium-over an eighth of a mile-and three stories high, will surely be stuck in its craw.
 
 
 161
 The second point which tips the scales for reversal, I believe, is the commission's treatment of environmental impact, a treatment required under the National Environmental Policy Act of 1969 ("NEPA").[31] This Act requires "all agencies" to "include in every recommendation or report on * * * other major Federal actions significantly affecting the quality of the human environment, a detailed statement" on-
 
 
 162
 (i) the environmental impact of the proposed action,
 
 
 163
 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
 
 
 164
 (iii) alternatives to the proposed action,
 
 
 165
 (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
 
 
 166
 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented. Section 102(2) (C) (i)-(v), 42 U.S.C.A. Sec. 4332(2) (C) (i)-(v).
 
 
 167
 In a very real sense this Act is a legislative response to and embodiment of the far-sighted and significant Scenic Hudson decision of this court[32] where the commission was directed in Judge Hays' words to "include as a basic concern the preservation of natural beauty," 354 F.2d at 624, and to give proper consideration to 'the totality of a project's long-range effects." Id. at 620.
 
 
 168
 The commission properly included a series of eight findings (211-18) purportedly dealing with NEPA, even though the record had closed before the Act became effective. In measuring those findings (and other findings) against the Act, to determine whether they constitute the detailed statement the Act requires, it seems to me we must bear in mind some of the declared goals of NEPA:
 
 
 169
 In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may-
 
 
 170
 (1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;
 
 
 171
 (2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;
 
 
 172
 (3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences. * * * 42 U.S.C.A. Sec. 4331(b) (1)-(3).
 
 
 173
 As recently pointed out by the Court of Appeals for the District of Columbia, "the very purpose of NEPA was to tell federal agencies that environmental protection is as much a part of their responsibility as is protection and promotion of the industries they regulate. Whether or not the spectre of a national power crisis is as real as the commission apparently believes, it must not be used to create a blackout of environmental considerations in the agency review process." Calvert Cliffs' Coordinating Committee Inc. v. AEC, 449 F.2d 1109 (D.C.Cir., 1971).[33]
 
 
 174
 Here the commission's Finding 217 says, incomprehensibly, "[a]ny short term adverse impact on the natural environment is more than offset by the enhancement of long term productivity which will result from the project". This is supposed to be a commission finding under NEPA, but I think the finding indicates that the commission did not read the Act very carefully. Section 102(2) (C) (iv), 42 U.S.C.A. Sec. 4332, requires a statement of "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity" (emphasis supplied). Not the short-term impact on the natural environment, but the short-term uses of it in relation to long-term productivity, is the statement required. Here we are considering permanent structures, a long-term and substantial use of an area of great natural beauty, "unique beauty," in the words of Scenic Hudson, supra, 354 F.2d at 613, involving an "irreversible and irretrievable commitment of resources" in the proposed project if licensed, to use the language of Section 102(2) (C) (v) of NEPA.
 
 
 175
 Finding 213 says that "there is essentially no conflict concerning alternative uses of available resources because with the exception of the small part of the Black Rock Forest to be flooded by the reservoir practically none of the other parts of the project preclude alternative uses of available resources." This finding, as the brief of the Scenic Hudson Preservation Conference suggests, completely omits the conflicting alternative use of preserving the area free from any utility installations, tailraces, abutments and access roads.
 
 
 176
 In Finding 215, the commission concludes under NEPA, and the majority opinion here relies upon the finding, that none of the most likely proposed alternatives "could be sited within one hundred miles of New York City with any less physical impact on the environmental aspects of the affected area than the Cornwall project." In this day of high voltage transmission, what is so magic about one hundred miles?[34] Are all areas wihin one hundred miles of New York City to be treated alike for electric generating purposes? Or are they all to be made to look alike, so that we will no longer have to be concerned how they are treated?
 
 
 177
 Finding 217 says "[t]he resources which will be committed to this project are the acreage it will necessarily encompass and the fuel resources which will be committed to pumping energy" which are "many times over" outweighed by "the electric energy resources which will be generated by the commitment of such resources." But this finding overlooks both points mentioned earlier in this dissent, the risk to the Aqueduct and the increase, however temporary, of air pollution in the City to generate pumping power. To view plant-citing at Storm King Mountain as only a commitment of "acreage,"[35] rather than as a commitment of a scenic wilderness area-albeit with some past intrusions and some present fairly easily rehabilitatable defacements-to a massive, if partially hidden, power structure, is to beg the question of environmental preservation.
 
 
 178
 The extent to which the commission has in this proceeding too readily rubber-stamped Consolidated Edison's plans is indicated by its authorization of an alternative project within Palisades Interstate Park. The commission overruled its own examiner in this regard and the choice of an alternative site flies in the teeth of the Park Compact that the lands included within the Park "shall be used only for public park purposes." 50 Stat. 719, Section 3.
 
 
 179
 It would seem that the specific authority of Congress is needed for the development, transmission or utilization of power within the limits of a national park. See 16 U.S.C. Sec. 797a.[36] Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 413, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971), speaks of "the few green havens that are public parks," albeit in another connection. I would protect those "few green havens." See Scenic Hudson, supra, quoting former Federal Power Commissioner Ross:
 
 
 180
 [I]t appears obvious that had this area of the "Hudson Highlands" been declared a State or National park, that is, had the people in the area already spoken, we probably would have listened and might well have refused to license it. 354 F.2d at 614-615.
 
 
 181
 This being the second opportunity the commission has had to follow the mandate of this court, and it having failed to do so as I suggest above, I would conclude, as did then Circuit Judge Burger in an FCC case, "that it will serve no useful purpose to ask the Commission to reconsider the Examiner's actions and its own Decision and Order. * * *" Office of Communication of the United Church of Christ v. FCC, 425 F.2d 543, 550 (D.C.Cir. 1969). I would therefore reverse, without a remand.
 
 
 182
 ON Petitions for Rehearing and Hearing en Banc
 
 
 183
 FRIENDLY, Chief Judge.
 
 
 184
 Petitions for a rehearing containing a suggestion that the action be reheard en banc having been filed herein by counsel for Scenic Hudson Preservation Conference; the Sierra Club and its Atlantic Chapter; the Izaak Walton League of America, National Audubon Society and National Parks and Conservation Ass'n; The City of New York; and the Wilderness Society, a poll of all the active circuit judges having been taken, and a majority for rehearing en banc not having been obtained, it is ordered that said petition be and it hereby is denied.
 
 
 185
 Circuit Judges HAYS, MANSFIELD, OAKES and TIMBERS voted for en banc consideration.
 
 TIMBERS, Circuit Judge (dissenting):
 
 186
 I dissent from the denial of reconsideration en banc.
 
 
 187
 Aside from the fact that four of the eight active judges of this Court (including two members of the panel who heard and decided the case originally) have voted in favor of en banc reconsideration, it does seem to me that a substantial question of unusual importance is presented by the panel's application of the substantial evidence test in reviewing the FPC's determination that the benefits of the project outweigh the environmental damages.
 
 
 
 [1]
 All of the petitioners except Palisades Interstate Park Commission object to the licensing order of the Federal Power Commission in toto. The Palisades Interstate Park Commission opposes only the site 2 alternative which calls for the location of the powerhouse within Palisades Interstate Park. The objection of petitioner City of New York is based on the aqueduct and air pollution question alone. The Izaak Walton League of America rests its objection primarily on the fisheries question and other environmental factors. All other petitioners raise virtually all the issues discussed in this opinion. Intervenor Consolidated Edison Company of New York, Inc., supports the Commission's order, as does intervenor Town of Cornwall
 
 
 [2]
 One megawatt (mw) equals 1 million watts; one kilowatt (kw) equals one thousand watts. We will use the megawatt terminology throughout this opinion
 
 
 [3]
 Sive, Some Thoughts of an Enviromental Lawyer in the Wilderness of Administrative Law, 70 Colum.L.Rev. 612 (1970), seeks to provide support for such a position
 
 
 [4]
 Id. at 631 et seq. and 650-651
 
 
 [5]
 The Initial Decision was amended "only to provide for the location of a switching station at Carmel on Applicant's main transmission system instead of Kent; and for the redesign of the Cornwall East switching station and the Cornwall transformer gallery, in connection with the relocation of circuit breakers, bus and related equipment. * * *"
 
 
 [6]
 The Commission, disagreeing with its Hearing Examiner, authorized use of the alternative site within Palisades Interstate Park on the conditions to which we have referred above. In view of our denial of the petitions in this case, it will be unnecessary for us to review this last determination
 
 
 [7]
 The Commission noted that the annual peak loads have shifted from the winter season to the summer
 
 
 [8]
 See Prevention of Power Failures, A Report to the President by the Federal Power Commission July 1967, Volume I at 43-44
 
 
 [9]
 "It appears from the evidence that to be effective in such an event 70 to 75% of the spinning reserve should be synchronized and available in 30 seconds to one minute, with all of the reserve available within two minutes."
 
 
 [10]
 A Con Ed study had estimated a twenty year operating savings of $137,023,000
 
 
 [11]
 Several combinations of gas turbines and a nuclear unit were proposed. Con Ed believed that eight gas turbines would be required, Scenic Hudson, five. The staff study concluded that six somewhat larger units would be adequate. The Commission based its conclusions on the combination found by the Examiner to be most appropriate: seven turbine units coupled with a 1000 mw nuclear unit
 
 
 [12]
 The New Power Pool consists of the Upstate New York System and the Southeastern New York Companies (SENY). The Commission estimates that the seasonal exchange between these two would amount to 500 mw in 1975 taking into account the requirements for maintenance of generating capacity. Another 465 mw could be secured from the New England Power Pool and the Pennsylvania-New Jersey-Maryland Power Pool
 
 
 [13]
 The highway crosses the mountain at an elevation varying from 200 feet to 280 feet. The height of Storm King Mountain is 1,343 feet
 
 
 [14]
 The part owned by Harvard is a portion of Black Rock Forest, a 3,700 acre experimental tract of timber. About 240 acres at the east end of the forest would be acquired for the project. The remaining land will be unaffected
 
 
 [15]
 The Commission noted that all large ponds in the area are artificial
 
 
 [16]
 Of the one hundred and forty acres to be acquired by Con Ed, over 100 acres is to be transferred to the Palisades Interstate Park Commission for recreational use
 
 
 [17]
 This accords with the findings of the New England-New York Inter-Agency Committee, Report of the New England-New York Region, Subregion "E" (Hudson River Basin), 999(d) (reprinted as Sen.Doc. No. 14, 85th Cong., 1st Sess. (1957) which recommended for the Hudson River Gorge "* * * establishment of a system of highway waysides * * * to make available, in a safe manner, the scenic vistas of the countryside."
 
 
 [18]
 The propriety of the use by the Commission of the findings of the Advisory Council on Historic Preservation, set up by the Historic Preservation Act of 1966, 16 U.S.C. Sec. 470f (Supp.1971), is the subject of some dispute. The Advisory Council found that plans for the project would have a "minimal adverse effect" on the scenic values of the area. Petitioner Scenic Hudson contends that the Council's finding is not only contrary to evidence but also that it ought not to be considered by the Commission because Scenic Hudson did not participate in the deliberations of the Council while the Commission's staff did. The Commission ruled that it had a statutory obligation to consider the report. We need not resolve this minor issue since the Commission stated that its "finding is made on the basis of record evidence, independent of consideration of the findings of the Advisory Council, which simply affirms our conclusion."
 
 
 [19]
 Scenic Hudson's witness, Raney, testified:
 "Anything that man does is substantially opposed to nature. So if you build any sort of a structure you will have situations which are not found naturally in the environment so here you have an additional situation where you have fishes drawn up into an artificial impoundment, eggs drawn up, larvae drawn up, possibly thirty species upon which they feed. So it is a very complicated business to try to evaluate the overall effect this will have. But basically the effect will be harmful to the fishes.
 I think anything that affects any substantial number of eggs, larvae, young or adult, could ultimately have a substantial effect on a fishery. But the degree of the effect I don't know."
 
 
 [20]
 Con Ed is required by the license order to follow recognized guidelines for the construction of overhead transmission lines. Article 35(5) of the Commission's license order includes the guidelines contained in the Hudson Valley Power Commission's "Power Lines and Scenic Values in the Hudson River Valley." In addition, Con Ed is bound by the Commission's Order No. 414 which prescribes general regulations for the "protection and enhancement of aesthetic and related values in the design, location, construction, and operation of project works" (35 Fed.Reg. 18585 (1970))
 
 
 [21]
 That statute provides:
 "Nothing in sections * * * of this title shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested rights acquired thereunder. * * *" 43 U.S.C. Sec. 383 (1964).
 
 
 [22]
 Torris Eide, consultant engineer to the Chief Engineer of the New York City Board of Water Supply testified that the removal of 254,000 cubic yards of rock might disturb the equilibrium in the forces within the rock formation, and thus present a risk to the Aqueduct. However, he had conducted no geologic or seismic tests of the area. Thomas Fluhr, engineering geologist and consultant to the New York City Board of Water Supply testified that the rock in the area appeared to be under stress. He stated "[t]he risk of failure of the aqueduct cannot be regarded as imminent but it represents a definite hazard." He conceded that the risk was small, but stated that "there certainly is some risk." He too had made no surveys beyond general mathematical studies. Malcolm T. Wane, Associate Professor of Mining and Engineering at Columbia University, testified for the City that he found that a vertical stress relief of 14% and a horizontal stress relief of 11% would result from excavation. He did not know what effect such changes would have since the present state of equilibrium of the Aqueduct was unknown. Don Deere, Professor in the Department of Civil Engineering and Geology at the University of Illinois, testified that there were too many unknowns to permit evaluation of stress changes. He believed that "there was a small but real risk involved to the present aqueduct because of the changes in stress and other activities associated with the construction of the project at this site."
 
 
 [23]
 The Act became effective January 1, 1970
 
 
 [1]
 The FPC findings on the feasibility of purchasing, rather than creating, power are not entirely consistent. Finding 82 says in pertinent part:
 If the energy necessary to pump Cornwall comes from polluting power plants in New York City that would otherwise be idle, little or nothing would be gained in reducing the air pollution problem. Based on the assumption that Cornwall would go into operation in 1972 a Staff study introduced in evidence showed that by 1980 approximately 89 percent of its pumping requirement could be met by virtually non-polluting sources of generation. Cornwall, to the extent that its water is not pumped by power from Con Ed low cost nuclear plants will be powered primarily from sources in areas adjacent to the Con Ed service area, and perhaps by imported Canadian hydro-electric power.
 Finding 134 says in pertinent part:
 Another considered alternative to the Cornwall development is the possibility of purchased power from Canada, namely from Churchill (Hamilton) Falls project, now under construction. To be a proper source of power supply, the energy from Canada would have to be taken substantially 24 hours per day; otherwise this would not be an economic source. The transmission distance involved and the relatively high cost of transmission facilities makes Churchill Falls power comparable to base load nuclear power or base load mine-mouth power or other sources of base load power outside of New York City, rather than an alternative to the Cornwall development. There is no indication when, if ever, Churchill Falls Power might be available to electric systems outside of Canada. In addition, there is no assurance that it would be available upon system separation.
 It has been reported that on July 30, 1971, "dedication ceremonies" were held for a 345 KV transmission line linking the Canadian New Brunswick Power Commission with twelve investor-owned and two cooperative New England Utilities, with a power transfer capability of 600 megawatts. The intertie runs 230 miles southeast from Frederickton, New Brunswick, to Wiscasset, Maine. In its first 25 days of operation it transmitted 58,000,000 KWH of base-load and peaking energy. Other Canadian interconnections total about 3540 MW, including 2,000 MW to New York and Michigan. See Public Power Weekly Newsletter (A.P.P.A.), Aug. 6, 1971, at 5. It is also interesting to note that on July 21, 1971, Senators Metcalf and McGovern introduced S. 2324, a bill to establish "a national power grid system," the underlying concept of which was perhaps first advanced by the father of modern conservation, Governor Gifford Pinchot of Pennsylvania. In the course of Rhode Island Representative Tiernan's remarks on the companion House Bill (H.R. 9970), he said:
 Only with a national grid system can we assure all Americans an adequate and reliable supply of electric power. * * * An [sic] an example of how the national grid could accomplish this, consider the acute power shortage which struck New York City in 1969. Basin Electric Power Cooperative in North Dakota, along with the Bureau of Reclamation and Missouri Basin System wired Consolidated Edison in New York to say that they would supply all of the power New York needed. The city remained dim, however, because there was no way to transmit the power from North Dakota to New York. Had a national grid existed, this power would have been readily available to the energy-starved area. 117 Cong.Rec. H7005 (daily ed. July 21, 1971).
 
 
 [2]
 Section 207 of the Federal Power Act, 16 U.S.C. Sec. 824f, does not speak of conserving use of electrical energy, a policy which Consolidated Edison, the applicant here, is at least partially promoting with its 1971 "Save-A-Watt" advertising campaign. Nor does Section 311, 16 U.S.C. Sec. 825j (dealing with the investigatory and information-gathering function of the FPC) in any way refer to conservation of the environment. We are left with Congressional policy underlying the Federal Power Act that is read to assume that future electrical needs will increase and that the only way to meet them is to construct more and more generating capacity. This is an assumption that certainly bears re-examination [see P. Ehrlich & J. Holdren, "The Energy Crisis," Saturday Review, August 7, 1971, at 50], and one which automatically-in the present state of the generating art-involves a consumption of depletable natural resources (coal, oil, natural gas, uranium), an adverse impact of one sort or another on the environment, or both. The 1970 National Power Survey (FPC) Pt. II estimates annual "peak demands" for the metropolitan New York City power supply area at 7,350,000 Kilowatts in 1970, 13,360,000 in 1980 and 21,160,000 in 1990, id., at II-1-8, and on this basis one could argue for perhaps three or four Storm King projects. The same report makes reference, inter alia, to the problems of air pollution from coal-fired plants, id., at II-1-19; depletion of oil and gas reserves, id., at II-1-19, 27; thermal pollution by nuclear plants, id., at II-1-48; thermal discharges generally, id., at II-1-49; ash disposal and nuclear fuel disposal, id., at II-1-50. See also Sarvicki, "The National Power Crisis and Its Effect on Rural America," Rural Electrification, June 1971, at 15; M. Katz, "Decision-making in the Production of Power," Scientific American, Sept. 1971, at 191
 
 
 [3]
 See Council on Environmental Quality, Environmental Quality-The Second Annual Report 25-26 (Aug. 1971). Sec. 102 of the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. Secs. 4321-4347, directs "all agencies of the Federal Government" to
 (A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;
 (B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by title II of this chapter, which will insure that presently unqualified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;
 (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on-
 (i) the environmental impact of the proposed action,
 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
 (iii) alternatives to the proposed action,
 (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
 Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;
 (D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources; * * * 42 U.S.C.A. Sec. 4332.
 The efficacy of this Act is in large part dependent on the decision in the instant case; as Schroeder puts it in "Pollution in Perspective: A Survey of the Federal Effort and the Case Approach," Vol. IV, No. 2, Natural Resources Lawyer, 381, 419 (April 1971): "The key question ahead is whether, after balancing all pertinent considerations, an administrative decision is made that provides for less than full environmental protection-whether that decision will be upheld if challenged in the courts." It is interesting to note, although I place little significance on it here, that at a meeting of the Subcommittee on Environmental Quality Control of the ABA Committee on Environmental Quality, the Assistant to the Chairman of the FPC strenuously criticized NEPA, quoting a former AEC attorney who termed NEPA "an atrocious piece of legislation," calling it "woefully ambiguous," "an invitation to litigation," and expressing the hope that "reviewing courts will take a practical approach" and the fear that "to construe the statute as a rigid prescription of the quality or quantity of evidence required would quickly cripple the administrative process." Annex A, Minutes of Meeting 14, 19 (April 20, 1971). To what extent this genuinely reflects this agency's attitude toward NEPA, however, is doubtful; one might hope that Congressional concern with the U. S. environment might be given more respect by the Commission as a whole.
 
 
 [4]
 In addition to New York City, some twenty-four smaller communities tap into the Catskill Aqueduct. Any of those towns which rely on it exclusively for water would be perhaps more seriously endangered than the City by any damage to it
 
 
 [5]
 After the completion of the Aqueduct in 1913 there was considerable leakage in the No. 7 downshaft leading to the Hudson Tunnel, apparently attributable to the combination of hydrostatic pressure and "relief of stress" in the rock surrounding the tunnel. The tunnel had to be "dewatered" and a new shaft (No. 7A) which by-passed the failed section was drilled to correct the situation
 
 
 [6]
 Whereas, the Board of Estimate of the City of New York * * * authorized a grant and conveyance to the Palisades Interstate Park Commission, of the fee of the City-owned land herein-after described * * *
 Subject to the following conditions, covenants and restrictions * * *:
 
 
 [1]
 The City of New York retains a permanent sub-surface easement to operate, maintain, and repair the Catskill Aqueduct which, at this location, is approximately 400 feet below the surface
 
 
 [5]
 Drilling of any kind is not permitted to depths greater than 200 feet below the present surface
 
 
 [7]
 When Consolidated Edison came up with its presently proposed project the City rather slowly moved to intervene and the FPC reopened the proceedings to take evidence on this project. Presumably we should not penalize the City for its delay on this, an issue of mountainous importance
 
 
 *
 References are to volume/page number of the transcript of the hearings
 
 
 [8]
 See Commission Staff Brief on Exceptions to Initial Supplemental Decision, February 12, 1970, at 11. The City itself takes the position that either to construct a by-pass of the Moodna Tunnel section of the Aqueduct or to line that section with steel would require an extensive shutdown of the Aqueduct with "a resultant risk to the integrity of the Aqueduct."
 
 
 [9]
 By "by-pass" here it is unclear whether the Commission was referring to the tunnel from the reservoir to the power station
 
 
 [10]
 Cf. Schneiderman v. United States, 320 U.S. 118, 129-31, 63 S.Ct. 1333, 87 L.Ed. 1796 (1943); Kelley v. Everglades Drainage District, 319 U.S. 415, 422, 63 S.Ct. 1141, 87 L.Ed. 1485 (1943); Brown Paper Mill Co. v. Irvin, 134 F.2d 337, 338 (8th Cir. 1943)
 
 
 [11]
 "Further, the project must be safe so as not to endanger life, health and property." Commissioner Ross, dissenting in Consolidated Edison Co. of New York, Inc. (FPC March 1965), rev'd in Scenic Hudson Preservation Conf. v. FPC, 354 F.2d 608 (2d Cir. 1965), cert. denied, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966). See also Section 10(c) of the Federal Power Act, 16 U.S.C. Sec. 803(c), requiring a licensee to "conform to such rules and regulations as the Commission may from time to time prescribe for the protection of life, health and property," and rendering the licensee liable "for all damages occasioned to the property of others by the construction * * * of the project works. * * *"
 
 
 [12]
 Mr. Fluhr was originally engaged by the consultants to Consolidated Edison Co. and later by Consolidated Edison directly, with the understanding that the interests of the City of New York would take priority. He thought the original surface plant, rejected in Scenic Hudson, supra, safe and "geologically sound."
 
 
 [13]
 "Air is our most vital resource, and its pollution is our most serious environmental problem." President Nixon's Message to Congress, reported in 21 BNA Environmental Reporter 0201, 0204 (Feb. 10, 1970)
 
 
 [14]
 See pt. II, at II-2-61-62
 
 
 [15]
 "Industries, power plants, furnaces, incinerators-these and other so-called 'stationary sources' add enormously to the pollution of the air. In highly industrialized areas, such pollution can quite literally make breathing hazardous to health, and can cause unforeseen atmospheric and meteorological problems as well." President Nixon's Message to Congress, 21 BNA Environmental Reporter at 0204 (Feb. 10, 1970)
 
 
 [16]
 New York City is subject to pollutants emitted in both a gaseous and particulate form from a wide variety of sources, including power generating plants. Finding 75
 It should be noted that serious air pollution episodes resulting from inversions have occurred in New York City in 1953, 1963, and 1966. An "inversion" occurs in periods of little or no wind when a layer of cold air covers a layer of warm air to prevent it from rising. Without an upward current of air or wind the pollutants cannot be dispersed. As a result, the pollutants mass in a thickening stagnant cloud above the area affected and they diffuse down to the ground line. While inversions are not very frequent, they can last for several days and can be present day and night. A typical episode, to which are attributed 168 deaths, occurred during the Thanksgiving holiday, November 22 to 26, 1966. Finding 76.
 
 
 [17]
 By utilizing energy surplus to system needs during night-time and week-ends, or purchasing low cost surplus energy from interconnected systems, Cornwall is designed to convert low cost surplus energy into high value energy during periods of peak demand. Finding 70
 
 
 [18]
 Consolidated Edison's eleven fossil fuel plants contributed in 1969 34 percent of the sulphur dioxides and 9.1 percent of the fly ash and other "particulate matter" that is so evident to the senses of sight and smell in New York City skies
 The United States Public Health Service estimates that in 1969 approximately 400,000 tons of sulphur dioxide and approximately 70,000 tons of "particulate matter" were emitted in New York City. Of that total, Con Ed's eleven fossil fuel plants accounted for approximately 156,000 tons of sulphur dioxide and approximately 6,400 tons of fly ash and other particulates, primarily from the combustion of bituminous coal and residual oil for the generation of electricity. Although Con Ed's emissions are less than half of what they were a few years ago, and are expected to be even less with the planned elimination by 1972 of coal and a further reduction in sulphur content of residual oil, Con Ed is likely to continue to be a substantial contributor to air pollution in the City so long as fossil fuel generating facilities comprise the greater part of its system. Finding 77 (emphasis supplied).
 
 
 [19]
 If the energy necessary to pump Cornwall comes from polluting power plants in New York City that would otherwise be idle, little or nothing would be gained in reducing the air pollution problem. Based on the assumption that Cornwall would go into operation in 1972 a Staff study introduced in evidence showed that by 1980 appoximately 89 percent of its pumping requirement could be met by virtually nonpolluting sources of generation. Cornwall, to the extent that its water is not pumped by power from Con Ed low cost nuclear plants will be powered primarily from sources in areas adjacent to the Con Ed service area, and perhaps by imported Canadian hydroelectic power. Finding 82
 
 
 [20]
 The FPC argues this is impractical, because electrical energy "flows through a system like Con Edison's in a unitary fashion." But surely the Commission's great expertise in transmission matters can come into play here: experience must have shown what the minimum safe loading parameters are for night-time baseload plants to assure the necessary system stability and to provide the necessary load service; operation above such limits, with possible exceptions for emergency situations, could be prohibited as a condition to the license
 
 
 [21]
 Assuming it is initially necessary to utilize some City generated power for pumping purposes it is unrealistic to suggest that the fossil fuel generating units which would be so utilized would not be the most efficient that the system has. The evidence is that the more efficient fossil fuel units, even at the 1.4 to 1 ratio, will utilize less fossil fuel per megawatt hour of generation for pumping off-peak hours than would be used by the less efficient units which, absent Cornwall, would have to be utilized to meet peak loads. To the degree that Con Ed does use City-generated power to pump water at Cornwall, which may occur to some extent during the first few years of the hydro project's operation, the record indicates that the type of fossil fuel used for the most part will probably be clean burning natural gas. During at least some parts of the year, Con Ed does not now, and probably will not, have enough natural gas available to generate sufficient power by gas turbines, steam generators, or otherwide [sic] to meet peak demand; it seems clear, however, that very subtantial amounts of gas will be available for power generation during the night-time hours, even during the peak of the heating season. To the extent that this gas-generated power is not needed to meet the City's night base load, it may be used to pump Cornwall. Finding 84
 
 
 [22]
 Pub.L. 91-604, 84 Stat. 1676 [see especially new Sec. 111(d)], 1 U.S.Code & Admin.News, 91st Cong., 2d Sess., p. 1964 (1970)
 
 
 [23]
 See City Petition for Rehearing p. 19 (R. 276, 694). Nitrogen dioxide, one of the oxides, is apparently a component of smog, very injurious to the respiratory system; the City's Department of Air Resources estimates that nitrogen dioxide levels of 0.01 ppm (4 hr. average) for more than three days are dangerous to health, and levels of 0.05 ppm (4 hr. average) promote smog formations. Those levels are already exceeded in the city. With the thought that operation of the city-located plants will be in the relatively still night-time air, one has visions of economical and efficient pumping at Storm King while New Yorkers cough and gasp for breath
 
 
 [24]
 The Commission's brief argues from the testimony of EPA witness Longaker that "the use of sulfur oxide served as a more important 'parameter or index of pollution from large stationary sources' than particulate emissions," as if to tell the court that the index of nitrogen oxide emission is unimportant. I take it that "particulate emissions" consist of fly ash, grit and solid matter, and may or may not include nitrogen oxides
 
 
 [25]
 See note 22, supra
 
 
 [26]
 The City argues, in its petition for rehearing filed September 18, 1970, that Consolidated Edison's 800 MW plant at Astoria additionally burdens city air above acceptable federal levels with both sulphur and nitrogen oxides, as well as particulates
 
 
 [27]
 "It is not to be forgotten that the mountain we are talking about is 'unique,' 'a mountain which should be left alone * * * [and which is] awesome * * monumental * * *,"' to quote some of the testimony duly recited in Commission Findings 143 and 145
 
 
 [28]
 Finding 191
 
 
 [29]
 Finding 189
 
 
 [30]
 Finding 156
 
 
 [31]
 Pub.L. 91-190, 83 Stat. 852, 42 U.S.C.A. Secs. 4321-4347, eff. Jan. 1, 1970
 
 
 [32]
 "Scenic Hudson, by placing a positive responsibility on the FPC to consider less environmentally damaging alternatives, laid a foundation for the obligation to develop alternatives imposed by NEPA." Council on Environmental Quality, Environmental Quality-The Second Annual Report 160 (Aug. 1971)
 
 
 [33]
 The Court was of course speaking of the AEC, but the language of the opinion is equally applicable to the FPC
 
 
 [34]
 See, e. g., note 1, supra
 
 
 [35]
 See also Finding 188:
 * * * Limiting the external features at the powerhouse site to the portal entrance tailrace, and access road, totalling approximately 3 or 4 acres-out of Storm King's total of over 400 acres-should reduce to a minimum the visual impact on the scenic vistas of Storm King Mountain or the Highland Gorge of the Hudson River and thereby preclude any material scenic impairment or detriment.
 See also Commission Brief p. 56.
 36 * * * [N]o permit, license, lease, or authorization for dams, conduits, reservoirs, power houses, transmission lines, or other works for storage or carriage of water, or for the development, transmission or utilization of power within the limits * * * of any national park or monument shall be granted or made without specific authority of Congress.
 Congressional approval of the Palisades Interstate Park Compact by resolution on August 19, 1937 (50 Stat. 719) would seem to raise the Compact to the status of federal legislation. Petty v. Tennessee-Missouri Bridge Comm'n, 359 U.S. 275, 278, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959); Delaware River Joint Toll Bridge Comm'n v. Colburn, 310 U.S. 419, 427, 60 S.Ct. 1039, 84 L.Ed. 1287 (1940).